SPORTATORIUM, Inc., et al. v. STATE.

No. 12469.

Court of Civil Appeals of Texas. Dallas.

March 20, 1937.

Rehearing Denied April 17, 1937.

be unlawful for any person to conduct, within any period of one hundred sixty-eight (168) hours, in public competition for prizes, awards, or admission fees, more than one (1) such personal, physical or mental endurance contest at the same place or location, and in which any of the same contestants engage"; also, section 7, reading: "Any house, structure, building, place or open air space that is being used for the purposes in violation of the provisions of this Act is hereby declared to be a common nuisance. Any person who knowingly maintains or assists in the maintaining of such a place is guilty of maintaining a nuisance." Also section 8, among others, makes it the duty of the district attorney, on reliable information that such nuisance exists, to file suit in the name of the State against whoever is maintaining the same, for its abatement and to enjoin its future maintenance.

While appellants in their brief have not questioned the constitutional validity of the statute in question, it was suggested at the oral argument that it was of doubtful validity. We think the act is valid and that in its enactment the Legislature was clearly within the proper exercise of its police power for the protection of the health and morals of the people. City of Birmingham v. Leo A. Seltzer, Inc., 229 Ala. 675, 159 So. 203; Pughe v. Lyle (D. C.) 10 F.Supp. 245; Weaver v. Stone (D. C.) 11 F.Supp. 559.

The facts show that appellants were engaged or interested in an attraction designated on their admission tickets as the "Battle of the Champions," "Derby Show," "The 1937 Version of the Walkathon," conducted in a building known as the "Sportatorium," located near the intersection of Industrial boulevard and Cadiz street, near the limits of the city of Dallas. Four deputy sheriffs of Dallas county witnessed these performances (relieving each other at the vigil) from Friday, February 19, 1937, at 1:56 p. m. to 11 p. m. Saturday, February 20th; also by Harold McCracken, assistant district attorney, who attended same from 7:30 p. m., November 18, 1937, to about 11 p. m. same day, and again on the night of February 19th, and also on Saturday night, February 20th, from 11:30 to 1:45 a. m. February 21st. These witnesses observed the crowds, the different physical acts and performances of the participants, and heard the announcements made by the manager of the performances,

J. E. Newberry, Robert L. Hurt, and M. R. Irion, all of Dallas, for appellants.

Andrew Patton, Guy L. Mann, and E. G. Moseley, all of Dallas, for the State.

LOONEY, Justice.

The State of Texas, through Hon. Andrew Patton, District Attorney for Dallas county, brought this action against the Sportatorium, Inc., W. T. Cox, Max Grossman, and Red Norton (and two others, later dismissed from the suit), under the provisions of article 614b, Vernon's Ann. P.C. (an Act of the 43d Legislature, 1934, Second Called Session, p. 131, c. 62), also under the provisions of article 4664, R.C.S., alleging that defendants were maintaining a nuisance, as defined in said articles of the statute, praying that on final hearing the nuisance be abated and enjoined and, in the meantime, that defendants be temporarily enjoined from maintaining same. Appellants denied that they were guilty of maintaining a nuisance, on the contrary, were conducting merely a floor show, not in violation of any law. On hearing, the court granted the temporary writ, from which this appeal was prosecuted.

The applicable sections of article 614b are: Section 1, which reads as follows: "It shall hereafter be unlawful for any person to conduct in public competition for prizes, awards or admission fees, any personal, physical or mental endurance contest that continues longer than twenty-four (24) hours"; section 2, "It shall hereafter

and the advertisements broadcasted over radio from the building. The entertainments begun Thursday, February 18, 1937, at 9 p. m. and ended Monday, February 22d. At first, about 34 couples (a man and a woman) participated in the performances, the participants being persons who formerly had training for this character of entertainment. During the first night, 5 participants were eliminated; the second night 8 more were eliminated, and at the close only 20 couples remained, the others having been eliminated under some order or rule of the management. The same persons participated throughout the performances, until eliminated—that is, the 20 couples remaining at the end were among those at the beginning. Their physical activities were dancing or walking around on the platform built in the center of the arena, and were required to be continually in motion for 45 minutes of each hour during 22 hours of each day, 15 minutes of each hour and two hours—from 5 to 7—each morning were allowed for rest, sleep, recreation, etc. As touching the character of the performances, Mr. Grossman, one of the defendants, testified that at 1:30 p. m. Saturday (February 20th) their Mr. Hall announced over radio, as follows: "Again we greet you from the Sportatorium here at Cadiz and Industrial Boulevard, in the Derby Show of 1937. Now, the markers on the score board tells us that forty training periods have elapsed, and that there have been more disqualifications last night. We had thirty-one teams and now six have been eliminated in the first 24 hours, and now we understand that there have been eight disqualifications during the night, of boys and girls who have violated the rules and regulations of the Derby Show, and have been eliminated, and before we go on I want to tell you that the Derby Show has hit Dallas, and thousands of guests have been over here, and have congratulated us on the fine manner in which the Derby Show has been presented, and the very nice bunch of girls that we have, and the dancers and singers out there to make the complete twenty-three hours of entertainment by the Derby Floor Show, and we are under way for the greatest night tonight of the entire forty-six training periods, and now we are going to have more fun with our Saturday Night Frolic, and our program this afternoon is particularly complete, and the price of admission is one dime, and about six o'clock they go off. There were many disqualifica-

tions during the night; it started at 1 last evening and they (mentioning nam persons disqualified) were eliminate violation of the rules and regulation. 10:30 No. 35, a brother and sister team, were eliminated, and it happened again at 11:45 this morning, and the young lady of team No. 37 was eliminated, and again this morning at 4:30, couple No. 20 were disqualified. So, that leaves at this time twenty-five teams and four boy solos out there, and the going is getting to be a little bit rough. There were many dance numbers presented, and each evening of the Derby Show we are going to allow the boys and girls to get out on the floor and dance, and at 11:55 tonight we will have another dance just for you, for the first European Midnight Frolic, and we have arranged for horns and hats and noise-makers and there will be a frolic, and we will have our master of ceremonies and our orchestra, and we have made plans to stay out all night tonight. Now, we are going to present some entertainment for you by Miss Kate Gary, the partner of Jackie Parr. Last evening, there were eight disqualifications, and there are now twenty-four defending teams in the battle of the Marathon Champions and this afternoon there will be just as much fun, with someone falling to the floor and being eliminated for violation of the rules; we have a man watching them to see that their two knees do not touch the floor. We don't believe in allowing boys and girls to crawl around on the floor and allowed to carry on. We do not believe that a boy or girl should be allowed to stay out there any longer than they can stand on their feet. In other words, if they fall down once that is enough to disqualify them. So, it is more or less a case of staying awake and keeping in good touch with your partners, and it is like a three-ringed circus. There are twenty-five teams doing different steps on the same dance number, and there are thousands of fans who have been to the Derby Show this season who say they have never seen such a great field of entertainers. The floor judge has called for a dance number, and that means drop everything but your partner, and on with the dance. The price of admission in the day is fifteen cents, and after 5:00 o'clock twenty-five cents." And again, at 4:15 p. m. the following announcement was made over radio: "Good afternoon, ladies and gentlemen. We are speaking from the Sportatorium here at Dallas, for the Derby

Show of 1937, and all the boys and girls have just returned to the floor after having completed one of their fifteen minute rest periods. And tonight is the great night. Thursday night there were thirty-two teams started off, and the first night there were five of them eliminated. Last night there were eight more eliminated, and we now find ourselves with twenty-five couples and four boy solos. The boys and girls are arranged on each side, and our preparations are under way for the greatest night of all tonight, beginning about sunset and winding up tomorrow about sunrise. The floor judge is now ordering the first dance number. Ladies and gentlemen, everyone came back very happy, and I will tell you that twenty-five teams and four solos did come back to the floor and our guests found the greatest field of entertainers they have ever seen before. Most of the boys and girls are champions or runners-up, and when you see what we have out on the floor, with every boy and girl dancing, if you want to get in on all the fun come at 6 o'clock and plan to stay till sunrise Sunday morning. The price of admission is fifteen cents up to 5 o'clock and after that twenty-five cents. The address is Cadiz and Industrial Boulevard. Now, I am going to call Pee-Wee Collins back here. He is being sponsored by the J. B. Cab Company, phone 2-8484. Now, ladies and gentlemen, this is Pee-Wee Collins here at the Derby Show, and it is Saturday night at the Derby Show, and all plans are under way for the Derby Show tonight, singers, dancers, and entertainers, and our master of ceremonies will be here and the floor judge. Here is another dance. Now, another regular dance number has been completed here, and I would like to have Mickey Martin hurry back over here, of Team 23. Here are two teams being sponsored by the Red Top Ale Company, and another team being sponsored by the Falstaff Brewing Company. This is the Derby Show of 1937, Saturday night, and plenty of noise."

■ Mr. McCracken, assistant district attorney, testified that he was present at the opening of the entertainment, on the evening of Thursday, February 18th; that they had an orchestra, music and a master of ceremonies who introduced the participating couples, stating their past participation in other shows, also introduced the floor judge. Thereafter, the couples continually danced and walked around on the platform, the announcer stating that the object of the dance was to wear them (participants) down, the rule being that, if any one fell to the floor or their knees touched the floor, they were disqualified and eliminated. Witness was there again Saturday the 20th, no new participants appeared so far as he could tell, the former all being present except those eliminated, and that the participants had the appearance of being fatigued. Witness testified further to seeing several persons drinking liquor from bottles, and that about 1:30 a. m. the announcer asked if any one had a bottle; this brought cheering from the crowd; he then said if any one had a bottle, to reach in his pocket, pull it out, and then shake hands with his friends. As a result of this announcement, several bottles were exhibited, and three couples were observed drinking from bottles, and about 1:35 a. m. witness observed three men engaged in a scuffle, a policeman appeared and handcuffed one of them. Witness also testified that the announcer introduced the floor judge as being a well-known floor judge of contests and derbies. It was also announced that contestants would constantly be under the control and supervision of the floor judge, announcing the rule that, if any one fell to the floor with both knees, they would be disqualified and eliminated; or, if any one failed to return to the floor after a rest period, they would likewise be disqualified, and that at all times participants must keep constantly in motion— walking, dancing, moving on the floor for 45 minutes out of each hour. At intervals during the 45 minute periods of walking, etc., certain of the participants presented music and dancing, the others, not so engaged, kept their bodies constantly in motion. These performances were numerously attended, the average being 2,500 persons per day, being largely women and children during daytime; the performers received no salary or compensation in any form from the management, other than their lodging and meals served in the building, but we do not regard salary or pay to the performance an element of the offense charged. However, certain business concerns in the city of Dallas became their sponsors for advertising purposes, from which the performers made some money; they also sold pictures in the arena, and those entertaining the crowds with music and dancing received free will offerings pitched upon the platform. Altogether, from these various sources, the testimony

shows that they made good money, hence the conclusion that so long as performers continued to be performers they had an opportunity to make money from these sources.

The foregoing presents the material facts, which, we think, sustain the finding of the court to the effect that a common nuisance, as defined by statute, existed, and authorized the issuance of the temporary injunction.

The statute defines two offenses—in section 1 of article 614b, Vernon's Ann. P.C., above quoted, a public competition for admission fees of a personal physical endurance contest, continuing longer than 24 hours, is one offense, and constitutes the building where the same is exhibited a common nuisance; and section 2 of said article, referring to such contests continuing for 24 hours or less, provides that, where more than one such public competition of a physical personal endurance contest by any of the same contestants is held within a period of 168 hours, is a distinct offense, and constitutes the building where held a common nuisance.

The evidence shows that admission fees were charged those attending the performances; that the contest was public, personal and physical, and the evidence tends to show that the contest continued until the endurance of participants was broken down. The descriptive terms on admission tickets and in radio announcements are significant as indicating the character of performances given. The term "Derby Show" means the exhibition of a contest. "Derby" originally referred to a race between three year old horses, hence, as applied to the conduct of man, can only mean a physical endurance contest of some kind. "Battle of the Champions," to which the public was invited, has no significance other than that of a contest. In the radio address the announcer said, " * * * There are now 24 defending teams in the Battle of the Marathon Champions. * * * " The term "Marathon" had its origin in memory of the Greek who ran from Marathon to Athens, bearing victorious news (490 B.C.), hence its modern meaning is any race or physical endurance contest. The term "Walkathon" has been held to be a further variation of the marathon dance, in which contestants walk instead of dance. Weaver v. Stone (D.C.) 11 F.Supp. 559. The contest was, in our opinion, a continuous one and by the same participants, except those eliminated, and was broken only at short intervals, which, in our opinion, did not break the continuity of the contest. However, if it can be correctly said that, the contest lasted for less than 24 hours, yet the same participants continued through more than one such contest within a less period than 168 hours; hence, an offense was committed under section 2 of said article of the Penal Code, and in either event the building where the contest was held became and was a common nuisance.

However, appellants insist that, as the undisputed evidence showed that no physical endurance contest was had, the State wholly failed to make out its case. This contention is based on the testimony of defendants Max Grossman and Red Norton, who gave testimony to the effect that the words on the tickets and the language employed in radio addresses, tending to show a real physical endurance contest by the participants, were for advertising purposes, merely showmanship to attract the public, and that as a matter of fact no contest whatever was had; that the elimination of participants was by prearrangement, and not the result of their physical exhaustion, or for any reason, other than on orders of the management.

The weakness of this contention is, that the court was not compelled to accept the testimony of these witnesses as neutralizing or destroying the telltale words on the tickets and in radio addresses. The advertising propaganda was put forth before a lawsuit was thought of, and was binding on defendants as admissions deliberately made and entitled to more weight than subsequent denials made at the trial. In Southern-Pacific Co. v. Godfrey, 48 Tex. Civ.App. 616, 107 S.W. 1135, 1136, the court stated the rule that obtains in such a situation, as follows: "While advertisements frequently give a rose-tinted hue to the claims contained in them, and are too often published to deceive rather than to give truthful information, still we can see no reason why an admission made against a party's interest therein contained should not be permitted to confront him when a different state of facts is being contended for by him. It stands in the category of any other admission, and cannot be rendered incompetent evidence by the contention that it was only an advertisement to catch the credulous public."

■ While the court made no findings on the issue presented by the State, alleging that the Sportatorium was a common nuisance, in that, being a public pleasure resort, two or more persons assembled there for the purpose of drinking intoxicating liquors, as defined by article 4664, R.C.S., yet the evidence on that issue would, in our opinion, also have justified the issuance of the injunction. Public drinking from bottles was observed in the room where the performances were given, and empty bottles were gathered up after the performances, indicating that they were emptied by persons drinking while at the performances; besides, the conduct of the announcer, in publicly asking if any one had a bottle to take it from his pocket and then shake hands with his friends, showed not only that the management tolerated public drinking, but by clear implication invited such conduct on the part of those assembled.

Therefore, we are of opinion that the court did not err in issuing the temporary injunction, and its judgment is affirmed.

Affirmed.

BOND, Justice (dissenting).

The powers of government are intended to act upon the civil conduct of the citizens; and, whenever their conduct becomes such as to offend against morals or public decency, it becomes within the range of legislative authority. The policy of the law is not a matter of judicial consideration.

The Penal Code provides that the design of enacting it "is to define in plain language every offense" (Penal Code 1925, art. 1; Wimberly v. State, 98 Tex.Cr.R. 152, 265 S.W. 155); that no person shall be punished for an offense, if the law is so indefinitely framed or of such doubtful consideration that it cannot be understood. The Constitution also guarantees to every citizen the right to know the nature and character of the accusation against him. Const. art. 1, § 10.

In Anderson v. State, 113 Tex.Cr.R. 450, 21 S.W.(2d) 499, in construing a penal code (Vernon's Ann. P.C. art. 454c), denouncing a disturbance by one disguised "in such manner as to render his identity difficult to determine," the Court of Criminal Appeals held that such act was in violation of Const. art. 1, § 10, as failing to definitely and clearly describe the offense,

there being no rule fixed when the wearing of disguise would be within the provisions of the act.

In the case of Cinadr v. State, 108 Tex.Cr.R. 147, 300 S.W. 64, the defendant was charged under article 1374, Penal Code 1925, which declared that whoever "needlessly * * * kills any animal" was guilty of an offense. The Court of Criminal Appeals held that the term "needlessly killing an animal" was indefinite to a degree that it fails to meet the constitutional and statute provisions that one charged with an offense be informed of its nature.

In Ex Parte Slaughter, 92 Tex.Cr.R. 212, 243 S.W. 478, 26 A.L.R. 891, the court had under consideration article 820o, Vernon's Ann.Pen.Code Supp.1918, forbidding any person to operate or drive a motor vehicle on any public highway "where the territory contiguous thereto is closely built up, at a greater rate of speed than eighteen miles per hour." The court said: "The issue in the case before us resolves itself into whether one operating a car upon a public highway may with reasonable certainty know that the rate of speed at which he is moving at a given point on such highway is such as is forbidden by this law. If he can know this, the law should be upheld. If he cannot, then the law should not stand on the statutes, nor should any law whose language or effect is such that the citizen affected thereby cannot reasonably know when he is violating or about to violate same."

In Missouri, K. & T. Ry. Co. v. State, 100 Tex. 420, 100 S.W. 766, 767, Judge Brown, speaking for our Supreme Court, said: "A penal statute, such as now before us, must be couched in such explicit terms that the party upon whom it is to operate may with reasonable certainty ascertain what the statute requires to be done, and when it must be done; otherwise, there would be no opportunity for a person charged with the duty to protect himself by the performance of it according to the law."

In my opinion, the Penal Code here under consideration, prohibiting and punishing an accused from conducting any "personal, physical or mental endurance contest," if, indeed, such is the import of the law, as held by the majority opinion in this case, is so indefinite and uncertain as to be obnoxious to the Constitution and the statute of the State. There is no rule fixed when the contestants shall know

when they are within or without the law, if the construction of the statute is given to it, as in the majority opinion. However, approaching the question in the view that the act is constitutional, which all courts should resolve any fair doubt in favor of the constitutionality of all laws enacted by the legislative branch of our government, undoubtedly the State has wholly failed to show that appellants have violated the Penal Code.

The Legislature, in enacting the law under which this action is grounded, did not attempt to prohibit "personal, physical or mental endurance contest." The act was designed to regulate the conduct of such performances. Regulation is not prohibition. The caption of the act shows: "An Act to regulate the conducting in public competition for prizes, awards, or admission fees, any personal, physical or mental endurance contest; regulating the manner in which contestants may participate in such contest; prescribing the penalties for violation of this Act." S.B. 38, chapter 62, 2d Called Sess., 43d Leg., p. 131 (Vernon's Ann.P.C. art. 614b). The law obviously follows the caption:

"Section 1. It shall hereafter be unlawful for any person to conduct in public competition for prizes, awards or admission fees, any personal, physical or mental endurance contest that continues longer than twenty-four (24) hours.

"Sec. 2. It shall hereafter be unlawful for any person to conduct, within any period of one hundred sixty-eight (168) hours, in public competition for prizes, awards, or admission fees, more than one (1) such personal, physical or mental endurance contest at the same place or location, and in which any of the same contestants engage."

The expressed regulatory acts, and only those brought by the facts within such definition, are amenable, and the violation of every element is essential to a conviction of the accused: (1) there must be a "personal, physical or mental endurance contest"; (2) that such personal, physical or mental endurance contest shall be "continuous for twenty-four (24) hours"; (3) that such personal, physical or mental endurance contest shall be "in public"; (4) that such personal, physical or mental endurance contest shall be in "competition for prizes, awards or admission fees"; and, (5) that only one of such personal, physical or mental endurance contests, carrying all of the elements above stated, shall be conducted within any period of 168 hours. The failure of the State to prove any one of these essential elements is fatal to a conviction.

It might well be said that the evidence related in the majority opinion shows that appellants were guilty of conducting a personal, physical or mental endurance contest in a public place, and that appellants conducted more than one endurance contest within a period of 168 hours; but, under the plain language of the statute, such acts alone are not amenable. Such contests are not prohibited by law. To come within the purview of the statute, it is essential to show, in addition to the above elements, that the contestants were engaged in "competition for prizes, awards or admission fees," and that such competitive contest was "continuous for twenty-four (24) hours," and that more than one such competing and continuous endurance contest were had in 168 hours. "Competition" means: "Act of seeking or endeavoring to gain what another is endeavoring to gain at the same time; common strife for the same object." Webster. "Continuous" means: "Having contiguity of parts; without break, cessation, or interruption, unbroken; continued." Webster. There is not a scintilla of testimony in the record showing that the contestants engaged in the show were seeking or endeavoring to gain any prize, award, or admission fee; but, on the contrary, the evidence shows, and stated in the majority opinion, that: "The performers received no salary or compensation in any form from the management, other than their lodging and meals served in the building"; and, "certain business concerns in the City of Dallas become their sponsors for advertising purposes, from which the performers made some money; they also sold pictures in the arena, and those entertaining the crowds with music and dancing received free-will offerings pitched upon the platform." I fail to see how remuneration paid to the contestants in the manner outlined can be held to be competitive gain, or that two or more such contests within 168 hours offends against the statute.

Furthermore, there is no evidence showing or tending to show that the contestants engaged in the "walkathon" show, walked and/or danced continuously—"without break, cessation or interruption; unbroken; continued" (Webster, supra)—for 24 hours; but, on the contrary, the undisputed

evidence shows that out of every hour during the day the contestants discontinued their walk and dance, and were at liberty to do as they pleased for 15 minutes, and one period in every 24 hours they rested and slept for 2 hours. I fail to see how a walking contest, a "walkathon," can be deemed a continuous walk, when the contestants rested and slept for more than 5 hours out of every 24 hours of the day. Rest and sleep are antitheses to walk and dance, thus breaking the continuity of the "walkathon," and clearly within the purview of the law.

The majority gives considerable credence, as evidence of appellants' guilt, to an alluring speech of some radio announcer, an employee of appellants, and the credulously written advertisements employed by appellants to attract the public to its show. I think courts should give, as evidence of guilt, but little weight, if any, to such showmen's talk. Theaters, shows, and circuses frequently advertise to deceive, rather than give truthful information, exhibitions of showmanship. It is within the memory of the writer, that circuses advertised, exhibited circulars, and displayed posters depicting many unreasonable and unnatural things, defying the laws of gravitation and of nature, given in "rose-tinted hue," to attract the credulous public, which were never intended to happen; of course, never did happen. Such advertisements are merely showmen's talk, and without evidence that the things they claim would happen did actually happen, the talk is no evidence of guilt. It is well settled in this State, that an admission or confession of the accused himself will not establish the corpus delicti, that is, the body of the offense.

The State further relies for a conviction of appellants for maintaining a common nuisance under article 4664, R.C.S., on the fact that intoxicating liquor was drunk on the premises, and the majority opinion holds that the evidence is sufficient to warrant the accusation. Article 4664, provides: "Any * * * place * * * to which persons resort in assembling of two or more persons to the room for the purpose of drinking intoxicating liquor * * * is hereby declared to be a common nuisance." This act was passed in 1923, when it was unlawful to sell or possess intoxicating liquor, and before the repeal of the constitutional amendment relating to intoxicating liquors, and before

intoxicating liquors were authorized to be sold and possessed in Dallas county, Tex., by vote of the people. It is no longer an offense to drink one's own liquor in public places in Texas.

There is not a line of testimony in this case, showing that intoxicating liquor was drunk on the premises, or that two or more persons assembled to any room for the purpose of drinking intoxicating liquor. The evidence reveals that 2,000 or 2,500 people assembled at the theater, for the purpose of witnessing a floor show, consisting of music, singing, and dancing, and a "walkathon." No one assembled there "for the purpose" of drinking intoxicating liquors. The mere fact that two or three persons may have been seen drinking something, a beverage of some kind, from a bottle, and that bottles of some character, whisky, beer, or soft drink, were found about the premises, fall short, I think, of proving that two or more persons resorted there "for the purpose" of drinking intoxicating liquor, or that intoxicating liquor was drunk. Courts should not deprive a citizen of the right of use and enjoyment of his property in such manner as he may wish, because, forsooth, the personal conduct and habits of the citizen may be obnoxious to the idea or notion of some other person.

No act or omission is a crime, unless made so by statute, and, to warrant a conviction, the act or omission must be plainly and unmistakably shown within the definition of the statute and within both the letter and the spirit of the law, and, if there is any fair doubt that the statute has been violated, that doubt must be resolved in favor of the accused. There can be no constructive offense, and where the statute expressly limits or does not prohibit the doing of a certain act, only those brought by the facts within the statute and such definition are amenable. There is no such thing as common-law offenses in Texas; penal offenses are prescribed by statute, and, unless there is a violation of the statutory law proven in the manner required by law, the innocent presumption of the accused should prevail.

In the case of State v. Duke et al., 104 Tex. 355, 137 S.W. 654, 666, 138 S.W. 385, on certified question from this court, the Supreme Court had under consideration the right of the State to enjoin defendants from maintaining a disorderly house, in that they engaged in the business of selling

intoxicating liquors to members of its organization, the court said: "That statutes under which the injunction is sought in this case are penal, or, at least quasi penal, in their character, and are to be strictly construed. That, unless appellees could be prosecuted and convicted as keepers of a disorderly house under article 359 of the Penal Code, having in mind and in view the construction of this article by the Court of Criminal Appeals, and the decisions of this court, the relief sought herein by injunction ought to be denied."

I am not in accord with the majority opinion that the evidence in this case establishes a nuisance punishable by statute, or furnishes a basis for an injunction. No conviction would stand under this record. Therefore, I respectfully dissent from the majority opinion; the judgment of the lower court should be reversed and here rendered, dissolving the injunction.