Affirmed and Opinion filed _____________, 2003















Affirmed as Modified and
Opinion filed March 23, 2004.

 

 

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-02-00982-CV

____________

 

CATHERINE TAYLOR,
INDIVIDUALLY AND AS NEXT FRIEND OF CHARLES D. TAYLOR, NCM, Appellant

 

V.

 

AMERICAN FABRITECH,
INC., MIKE HICKS, SR., AND LMS RENTALS, INC., Appellees

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



On Appeal from the 155th District Court

Austin County,
Texas

Trial Court Cause
No. 97V-100




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



O P I N I
O N

            Catherine Taylor, individually and
as next friend of Charles Taylor, NCM, sued American Fabritech, Inc., Mike
Hicks, and LMS Rentals, Inc., for injuries Charles Taylor sustained when he
fell through a skylight while working on a construction project.  All parties appeal from a final judgment
awarding damages to Taylor
but awarding certain offsets to appellees.[1]

On
appeal, appellees contend the trial court erred (1) in admitting testimony from
several of the plaintiff’s expert witnesses, (2) in permitting the jury to view
the property where the accident occurred, (3) in permitting plaintiff’s counsel
to make improper jury argument, and (4) in refusing to declare a mistrial after
insurance coverage was mentioned before the jury.  Taylor
contends that the trial court erred in awarding offsets against the judgment
for payments from an employee benefit plan and for any governmental benefits
received.  The parties are familiar with
the facts, so we will not recount them in detail here.  We modify the judgment to remove the offset
for future governmental benefits and, as modified, affirm.

The Experts

            In their first issue, appellees
contend the trial court erred in denying their motion to exclude various
experts for Taylor.[2]  Stephen Estrin, a builder, testified
regarding construction safety issues and OSHA requirements.  Dr. Thomas Mayor, an economist, testified
regarding Charles Taylor’s lost earning capacity and the predicted costs of his
care.  Terry Winkler, M.D., testified
about the “Life Care Plan” he prepared for Charles Taylor, which provided for
medical care and living assistance.  Lastly,
Dr. William Havins, a psychologist, testified about Charles Taylor’s nervous
system injuries and his current and expected levels of function.

We
review challenges to the admission of expert testimony under an abuse of
discretion standard.[3]  The testimony of a qualified expert is
generally admissible when scientific, technical, or other specialized knowledge
will assist the trier of fact to understand the evidence or to determine a fact
issue.[4]  The trial court has the gatekeeper function
of ensuring that expert testimony is based on a reliable foundation and is
relevant to the issues in the case.[5]  Once the party opposing the expert testimony specifically
objects, the proponent bears the burden of demonstrating admissibility.[6]

            Appellees attack the reliability of each
of the experts’ testimony.[7]  In Robinson,
the Texas Supreme Court held that expert opinion of a scientific nature
required an initial inquiry as to whether the testimony was based on a reliable
scientific foundation, and the court went on to list certain factors it deemed
useful in such inquiry.[8]  In Gammill,
however, the court explained that although trial courts must assess the
reliability of all expert testimony, the Robinson
factors will not always be relevant to the inquiry, particularly when the
proffered testimony is based not on scientific research or theories but on the
expert’s experience and knowledge in his or her field.[9]

            Taylor’s experts in the present case were not
offering testimony of a scientific nature. 
Analyzing whether safety measures could have prevented an accident,
calculating the costs of medical care, lost earnings, and living assistance,
and explaining the severity of a person’s injuries are not scientific inquiries
under the Robinson/Gammill
framework.  In forming their opinions,
these experts relied not on specific scientific research or studies but on
their own experience, education, and review of the literature in their
fields.  Hence, the trial court was
required to consider whether the testimony was based on a reliable foundation
and whether it was relevant to issues in the case, but the court was not
required to analyze all of the specific factors noted in Robinson.[10]

In
cases involving nonscientific expert testimony, Gammill instructs us to consider whether there is an “analytical
gap” between the experts’ opinions and the bases on which they were founded.[11]  Thus, we will take a closer look at each of
the experts’ proffered testimony, the underlying foundation of that testimony,
and appellees’ specific complaints, if any, regarding the reliability of the
testimony.

            Estrin’s affidavit contained a
lengthy explanation of the subjects he expected to testify regarding and the
bases for his opinions.  Generally, he
expected to testify regarding Charles Taylor’s fall from a height, the
availability of fall prevention equipment and techniques, and the conditions at
the construction site.  He based his
testimony on his own experience and his knowledge in the fields of construction
safety and accident investigation.[12]  He stated that he had a master’s degree in
civil engineering and postgraduate certificates in occupational safety and
health and public safety, and he has been qualified by the Workmen’s
Compensation Commission of Texas
as a “professional safety source in construction.”  He has also taught courses on construction
safety and specifically has taught on fall protection.[13]  He stated that his analysis was based on
established principles of safety engineering and management and that his
investigative technique was widely accepted in the field, namely “to establish
the who, what, when, why, where, and how, to analyze the events based upon the
best available testimony . . . then to evaluate the building plans and
documents . . . .”  He listed various
regulations, articles, programs, product data sheets, and case documents he
relied upon in deriving his conclusions. 
In sum, there appears to be no significant analytical gap between
Estrin’s proffered testimony and the stated basis therefore.[14]

Against
Estrin, appellees further specifically complain that (1) he did not perform a
site inspection or review the sheriff’s accident report; (2) no affidavit or
deposition testimony was attached to the response to the motion to exclude; (3)
his testimony was not helpful as it was in the common knowledge; and (4) he was
wrong about the requirements of OSHA[15]
regulations.  Regarding the lack of a
site inspection, Estrin indicated it was not necessary in light of the building
plans and documents he was given.  It
should also be noted that he was shown, and allowed to review, the sheriff’s report
during his deposition, so by the time of trial he had, in fact, reviewed the
accident report.  Indeed, at the
deposition he stated the report contained nothing that would make him change
his conclusions regarding the incident.  Appellees’
second argument is based on an erroneous assertion because the record does
actually contain both deposition testimony from Estrin and an affidavit signed
by him.[16]  On the third argument, the subject of Estrin’s
testimony—the necessity and adequacy of fall protection around skylights in
building construction—is clearly not a matter within the knowledge of the
average juror.[17]  Estrin himself pointed out that he had taught
courses involving fall protection.  It
also appears highly unlikely the average juror would know what was available
for such construction work or what the standards for safety were in the
industry.[18]

Lastly,
appellees contend Estrin’s testimony was unreliable because he erroneously
stated that OSHA regulations are mandatory in Texas, citing Supreme Beef Packers, Inc. v. Maddox, 67 S.W.3d 453, 457 (Tex.
App.—Texarkana 2002, pet. denied).[19]  However, appellees cite to no place in the
record where they made this argument to the trial court, nor has our review found
any such argument.[20]  Appellees cite to a portion of the record
wherein they objected to the reading of OSHA regulations by Estrin before the
jury, but this objection was premised solely on the argument that the law
should be given to the jury only in the court’s charge and not read into the
record by a witness.  The argument is not
made at that point that Estrin’s testimony was unreliable because he made
erroneous statements regarding OSHA, nor is the objection made at the time
Estrin repeatedly made the objectionable statements.[21]  Accordingly, appellees failed to preserve
this argument for appellate review.[22]  In sum, we find the trial court did not abuse
it’s discretion in admitting Estrin’s expert testimony.

            Dr. Mayor expected to testify
regarding his evaluation of economic losses suffered by Charles Taylor due to
his impairment.  Mayor has a Ph.D. in
Economics, is a former chairman of the Department of Economics at the University of Houston, and has considerable experience
in the analysis of personal injury damages. 
In his deposition, he stated that he based his evaluation on standardized
principles in the field of economics that have been peer reviewed.  He further stated he reviewed the Life Care
Plan created by Dr. Winkler for Charles Taylor, as well as Taylor’s medical and employment records and
deposition testimony and interviews. 
Although he said he based his calculation, at least in part, on the
level of care in the Life Care Plan, he also said he could adjust his figures
accordingly if changes were made to that plan.  He further stated he based his present value calculations
on what has happened in the past, by looking at Taylor’s earnings history, as well as statistics
from the U.S. Bureau of Labor Statistics, the Census Bureau, and standardized
life expectancy tables.  He stated the
data in these resources are subject to elaborate review mechanisms and have been
found reliable.  Based on these
representations, we find the trial court did not err in finding Dr. Mayor’s
testimony was based on a reliable foundation.[23]

            Dr. Winkler expected to testify
about the Life Care Plan that he formulated for Charles Taylor.  This type of plan basically outlines a
disabled person’s future requirements in terms of medical care and living
assistance.  In his deposition, Dr.
Winkler stated he is a licensed medical doctor who is board certified in
physical medicine, rehabilitation, and spinal cord injury medicine.  He further said he is a certified life care
planner and has reviewed copious amounts of literature in the field as well has
having written on the subject, including portions of at least one textbook that
was peer reviewed prior to publication.  Winkler
further stated that he has prepared, and testified regarding, numerous life
care plans for other individuals.  In
preparing the Life Care Plan for Charles Taylor, Winkler said he reviewed Taylor’s medical and
nursing home records and performed a physical examination.  Based on this testimony, we find that the
trial court did not err in finding Dr. Winkler’s testimony regarding the Life
Care Plan was reliable as based on his training and experience in the field.[24]

            Dr. Havins expected to testify
regarding his evaluation of Charles Taylor’s physical, mental, and emotional
condition, as well as the sufficiency and efficacy of the Life Care Plan
prepared by Dr. Winkler.  In his
deposition, Dr. Havins identified himself as a neuropsychologist, which is a
field of practice concerning how injuries to the brain impact intellectual
function, emotions, and behavior.  He
stated he has a Ph.D. in psychology, and education, training, and experience in
neuropsychology.  He also said he used to
be the director of psychology at a rehabilitation hospital and currently works
as a neuropsychologist at a rehabilitation center.  In preparing his evaluation, Dr. Havins
stated he personally examined Charles Taylor and reviewed his medical records
and the Life Care Plan.  He further
explained the basics of a neuropsychological evaluation and the bases for his
opinion.  Based on this testimony, we
find the trial court did not err in finding Dr. Havins’ testimony sufficiently
reliable based on his experience and training in the field.[25] 

Jury View

In
their second issue, appellees contend the trial court erred in permitting the
jury to view the premises on which the accident occurred.  The jury view apparently involved a “drive
by” of the building to allow jurors to see the exterior but not to enter the
building.  The record does not
specifically reflect what the jurors saw during the site visit nor whether it
was possible to see the area of the skylights from ground level.  Jury views are generally considered improper
in Texas[26];
particularly where, as here, one side objects.[27]  Assuming jury views are error and assuming
error was preserved in this case, we must consider whether the visit
constituted harmful error.[28]  Before an appellate court can reverse a
judgment, it must determine the error committed by the trial court was
reasonably calculated to cause and probably did cause the rendition of an
improper judgment.[29]  To begin with, the jury view appeared to be
minimal in scope because, as described by the trial court, it merely involved a
“drive by” of the building.  Furthermore,
there was substantial evidence adduced at trial regarding the premises on which
the accident occurred, so the jury view was to some degree cumulative.[30]  Nevertheless, appellees contend the harmful effect
of the site visit is demonstrated by the “astronomical verdict” rendered by the
jury.  Of the approximately $20 million
verdict, over $16 million was awarded for past and future medical expenses and
zero was awarded in punitive damages after the jury found no malice.[31]  The medical expenses were supported by evidence
and appellees do not contest the sufficiency of this evidence; thus, the award
cannot establish harm from juror sympathy. 
The remaining sums do not appear astronomical given the extent of
Charles Taylor’s injuries, and the response to the question on malice is
clearly unavailing to appellees. 
Accordingly, we find the record does not support the conclusion that the
jury view probably caused rendition of an improper judgment.[32]  Appellees’ second issue is overruled.

Jury Argument

In
their fourth issue, appellees contend the trial court committed reversible error
when it permitted certain remarks made by appellant’s counsel during closing
argument.  Improper jury argument
requires reversal when: (1) there is error in the argument; (2) it was not
invited or provoked; (3) the error was preserved by an objection, motion for mistrial,
or motion to instruct; (4) the error was not curable by instruction, reprimand
by the judge, or proper withdrawal of the statement; and (5) the argument by
its nature, degree, and extent constituted reversible harmful error.[33]  Specifically, appellees assert Taylor’s counsel played
to the jurors’ sympathies when he said, “I’ve got kids and I know you’ve got
kids.”  To understand the comment, we
must first look at the context in which it was said.  During trial, Michael Hicks, Jr., son of appellee
Michael Hicks, Sr., testified that after Charles Taylor’s accident he installed
the remaining skylights using the same procedures Charles Taylor had used.  Further, during closing, appellees’ counsel
argued “After Charlie was sent to the hospital . . . Mike Hicks, Mr. Hick’s own
son, goes up to the roof, same manner, same procedures as Charlie did, and
installed the remaining sixteen, seventeen skylights. . . .  Again, no safety harnesses.  Not any other type of gear, because it was
not practical or reasonable to do that.”

Immediately
after Taylor’s
counsel’s comments, appellees objected that the comments asked “the jury to put
their steps in place of the parties.” 
Before the trial court could rule, Taylor’s
counsel offered to rephrase it.  Appellees’
counsel then requested a ruling, but before the judge could rule Taylor’s counsel explained
that “All I am saying is it defies common sense to do that, but is it
consistent with his behavior?  Sure.”

From
this context, we glean three important points: (1) counsel’s purpose was to respond
to appellees’ argument and convey that appellees’ actions regarding safety
protocol defied common sense, (2) to the extent counsel improperly asked jurors
to step in the parties’ shoes, he attempted to self-correct and focus his
comments, and (3) by failing to pursue the objection and obtain a ruling in the
face of the clarification, appellees’ counsel waived the complaint.[34]  Nevertheless, incurable jury argument may
still be grounds for reversal on appeal so long as the issue is preserved in a
motion for new trial.[35]  Appellees failed to raise this issue in their
motion for new trial.  Accordingly, it is
waived, and appellees’ fourth issue is overruled.

Mention of Insurance

In
their fifth issue, appellees contend the trial court erred in refusing to
declare a mistrial after an expert witness, Epstein, mentioned insurance during
trial.  The remarks came in the form of a
videotaped deposition that was to have been edited to remove the remark, but
which was not so edited.  On the
videotape, the following exchange occurred:

Q.        Well, do you think
Charles Taylor’s needs could be met at home versus at the Missouri Rehabilitation
 Center?

A.        At the time he was in Missouri Rehabilitation Center?

Q.        That’s correct.

A.        For part of the time,
yes.  Okay.  There was a long period of time when we were
asking for discharge, but I remember that there was some funding or insurance
problems that kept him there, that he could have gone home earlier, yes.

 

After the
insurance mention was brought to the court’s attention, the trial judge
instructed the jury as follows:

Members of
the jury, one of the problems with videotapes is that sometimes there are some
objections that are made, and there is not a Judge there to rule on those
objections at the time the tape is made. 
And then I have to rule on objections after I hear the tape.  We try to prevent anything being presented to
you that has been ruled by the Court’s objections [sic].  Sometimes the tapes are not edited properly,
or for whatever reason something gets in that should not have gotten in.  And I want to remind you of Instruction
Number Nine that I gave you when the trial first began.  And that instruction reads that you should
not consider, discuss or speculate whether any party is or is not protected in
whole or in part by insurance of any kind, unless evidence about insurance is
admitted.  And even though you might have
heard that word spoken, that was not admitted for the purpose of evidence.  And there is still no issue that you are to be
concerned about that involves insurance.

 

It is generally considered error for insurance coverage
of either party to be mentioned by the other party during trial of a personal
injury cause of action.[36]  If insurance is mentioned, the trial court
may either order a mistrial or instruct the jury not to consider the improper
statement.[37]  We presume, absent evidence to the contrary,
that the jury followed such an instruction.[38]  Appellees again point to the size of the
verdict as evidence of the effect on the jury, but, as noted above, a large percentage
of the verdict was for medical expenses which were supported by evidence and
not disputed on appeal and the jury did not find malice against appellees.  Under these circumstances, we find there is
no evidence to suggest the jury did not follow the court’s instruction.  Accordingly, appellees’ fifth issue is
overruled.

The Offsets

            In the judgment, the trial court
granted offsets as a matter of law to appellees for payments made to or for
Charles Taylor for medical care and disability under an employee benefit plan
(totaling $437,486.20), and for any governmental benefit that defendants
demonstrate Charles Taylor received before or after rendition of judgment,
provided the government does not make a subrogation claim for the
benefits.  On appeal, Taylor contends that both offsets violate the
collateral source rule.  Additionally,
appellees contend the trial court erred in denying (by operation of law) their
motion to modify the judgment to include specific amounts Taylor received from government sources.

            The collateral source rule is both a
rule of evidence and damages.[39]  Generally, it precludes a tortfeasor from
obtaining the benefit of, or even mentioning, payments to the injured party
from sources other than the tortfeasor.[40]  In other words, the defendant is not entitled
to present evidence of, or obtain an offset for, funds received by the
plaintiff from a collateral source.  When
the defendant tortfeasor is the employer of the injured plaintiff, payments
made under an employee benefit plan create a particular puzzle.  Basically, if the benefit plan is a fringe
benefit for the employee, it is considered a collateral source in regard to the
employer, but if the benefit was purchased for the primary purpose of protecting
the employer, then the plan is not a collateral source as against the employer.[41]  The reasoning is simple: if the plan was
purchased for the benefit of the employer then it should be entitled to an
offset for payments from the plan to the injured employee.

            In regard to the benefit plan offset
in the present case, Taylor
contends the evidence was insufficient (1) to show whether the employee benefit
plan was intended to protect the employer, (2) to establish the amount of payments
made, and (3) to support a finding that Hicks or LMS could receive an offset
when only Fabritech employed Charles Taylor. 
First, regarding whether the policy was primarily intended to protect
the employer, we begin by noting the defendants were not subscribers to the
Texas Workers’ Compensation Fund, and this is one indication the benefit plan
was for the protection of the employer.[42]  Additionally, the policy explicitly covered
only on–the–job injuries and was not a general insurance policy for the benefit
of the employee.  This also strongly
suggests the policy was intended to protect the employer and was not a fringe
benefit for the employee.[43]  Taylor
points out that there was no testimony provided to explain the purpose of the
policy.  Although testimonial evidence of
the benefit plan’s purpose would have been relevant, we find that, taken
together, the fact that appellees were not participants in the Workers’
Compensation Fund and the fact that the policy was strictly for on–the–job
injuries are sufficient to support the trial court’s determination that the
policy was for the protection of the employer, particularly since there is no
evidence to the contrary.[44]  Taylor
further points out that the policy language refers to a “Plan” but that no such
“Plan” was admitted into evidence.[45]  Appellees suggest that in the absence of the
plan it is impossible to know the nature of the payments made under the
policy.  To the contrary, the policy is
repeatedly quite specific in stating that coverage is solely for on–the–job
injuries; thus, any payments could only have been for on–the–jobs injuries.[46]  Once again, the policy language itself, along
with appellees’ nonparticipation in Workers’ Compensation, is sufficient to
support the finding that the policy was intended to protect the employer.[47]

            Second, we examine the evidence regarding
payments under the policy.  In Defense
Exhibit Two, Appellees submitted copies of a large number of checks written by
the insurance company to Fabritech and from Fabritech to Charles Taylor and various
health care providers.  Taylor argues
that the checks are insufficient to prove the amount paid because (1) several
do not reference Taylor’s name, (2) several do not mention the employer’s name,
(3) several do not include “an explanation of the basis of the payment,” and
(4) several are made payable to Fabritech. 
However, Exhibit Two is not as loosely organized as Taylor suggests.  Although there are checks that do not
reference Taylor’s
name, do not mention Fabritech, or do not mention a “basis of payment,” the
exhibit also includes charts and remittance statements that tie the checks from
the insurance company to Fabritech to the checks from Fabritech to Charles
Taylor and the providers.[48]  Therefore, the exhibit proves the funds were
spent for Charles Taylor’s medical needs. 
Taylor
does not contend that she made any evidentiary objections to Exhibit Two, and
we have found none in the record.  Nor
did she apparently make any other type of objection to the court’s receipt of
this evidence or offer any contradicting evidence.  Accordingly, we find the evidence sufficient
to support the trial court’s conclusion regarding the offset for payments under
the benefit plan.

            Regarding Taylor’s third argument, that there was no
evidence Hicks and LMS could receive an offset when only Fabritech employed
Charles Taylor, we note that prior to trial, the parties signed a stipulation
that Fabritech and LMS were operated as a single business enterprise that was
an alter ego of Hicks.  Taylor offers no suggestion as to why the trial
court could not have relied on this stipulation in determining that the
insurance policy was for the benefit of Hicks and his alter ego, the business
enterprise consisting of Fabritech and LMS. 
The stipulation explicitly pierced the corporate veil.  In sum, the trial court did not err in
awarding an offset for the insurance payments as they were not from a
collateral source.  Accordingly, Taylor’s first issue is
overruled.

            In her second issue, Taylor attacks the offset
for governmental assistance.  Unlike the
insurance benefit plan, the purpose of governmental assistance is clearly to
aid the injured person, not protect the employer/tortfeasor.[49]  Accordingly, the collateral source rule
applies, and appellees were entitled to neither an offset nor to present
evidence of any payments.  Appellees
argue, however, that an evidentiary exception applies that should have
permitted them to introduce evidence of government payments to rebut Taylor’s assertion of
poverty or financial distress.  Appellees
further suggest the trial court ordered a compromise in the form of an offset
to balance the interests of the parties when it did not admit the rebuttal evidence.  We begin by noting appellees cite no
authority that would allow such a compromise. 
It has been held that when a plaintiff seeks recovery of lost earnings
and claims financial hardship, evidence of a collateral source may be offered
to impeach the credibility of a witness regarding such hardship.[50]  However, none of the cases suggests an
offset, as opposed to rebuttal testimony, is a permissible compromise.  Indeed, the very point of rebuttal evidence
is just that—to rebut an assertion made by a witness or opposing party.  If evidence of a collateral source is
admitted as rebuttal evidence, it is for the purpose of rebutting the poverty
claim, and not so the jury can award an offset. 
Here, the court imposed offset did not rebut anything and was improper.  Accordingly, Taylor’s second issue is granted and the
judgment is modified to remove the offset for governmental benefits.

Appellees
do not raise an issue on appeal that the trial court erred in refusing to admit
rebuttal testimony regarding government payments; thus, we need not address
this issue.  Further, because we hold the
trial court erred in granting an offset for governmental benefits, we need not
address appellees’ third issue in which they contend the court erred in denying
(by operation of law) their motion to modify the judgment to include specific
amounts Taylor received from government sources.  Accordingly, it is dismissed as moot.

            The trial court’s judgment is
modified to remove the offset for governmental benefits, and as modified, it is
affirmed.

 

 

 

 

                                                                                                

                                                                        /s/        Paul C. Murphy

                                                                                    Senior
Chief Justice

 

Judgment rendered and Opinion filed March 23,
2004.

Panel consists of Justices Anderson and
Seymore and Senior Chief Justice Murphy.[51]

 

 











[1]
Prior to trial, the parties signed a stipulation that Fabritech and LMS were
operated as a single business enterprise that was an alter ego of Hicks.  We therefore refer to them collectively as
“appellees.”

 





[2] We
address appellees’ issues first because they request reversal of the judgment,
whereas Taylor
requests a modification of the judgment.

 





[3] E.I. du Pont de Nemours & Co. v. Robinson,
923 S.W.2d 549, 558 (Tex.
1995).

 





[4] Tex. R. Evid. 702.

 





[5] Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 728 (Tex. 1998); Robinson, 923 S.W.2d at 556-57.

 





[6] Robinson, 923 S.W.2d at 557.

 





[7] Except
as mentioned below regarding Estrin, appellees make no arguments regarding the
relevance of the experts’ testimony.

 





[8] Id.
at 557.  The factors include (1) the
extent to which the theory has been or can be tested; (2) the extent to which
the technique relies upon the subjective interpretation of the expert; (3)
whether the theory has been subjected to peer review or publication; (4) the
technique’s potential rate of error; (5) whether the underlying theory or
technique has been generally accepted as valid by the relevant scientific
community; and (6) the non-judicial uses which have been made of the theory or
technique.  Id.

 





[9] Gammill, 972 S.W.2d at 726–27.

 





[10] See id. at 726. Therefore, several of appellees’
arguments premised on the Robinson
factors are not relevant to our analysis. 
For example, appellees argue that each of the expert’s opinions (1) were
prepared exclusively for Taylor’s case, (2) were not subjected to peer review,
and (3) were subjective in nature, and that (4) the experts acknowledged two
different experts in their particular field might come to different conclusions
given the same data or scenario.  Regarding
these complaints: (1) it does not matter overly that the experts prepared their
opinions for this case because the foundation of their testimony (their
experience, education, and knowledge of their fields) was not so prepared; (2)
there is no requirement the particular non-scientific opinion in a given case
be peer reviewed, so long as the foundation for the opinion is reliable; (3)
the application of knowledge to a particular set of facts is inherently
subjective; and (4) experts frequently disagree; if the potential for
disagreement was a basis for refusing expert testimony such testimony would be
admitted only very rarely.  It is the
expert’s underlying reasoning or methodology that a trial court must assess for
reliability, not the expert’s ultimate opinion or conclusion in a given
case.  See id. at 724 (quoting Freeman
v. Case Corp., 118 F.3d 1011, 1016 n.6 (4th Cir. 1997)); Robinson, 923 S.W.2d at 555.

 





[11] Gammill, 972 S.W.2d at 727; see also JCPenney Life Ins. Co. v. Baker, 33 S.W.3d 417, 428 (Tex. App.—Fort
Worth 2000, no pet.).

 





[12]
Estrin stated he had “[p]ersonal/professional experience of over 4 decades as a
construction safety manager, general contractor, construction superintendent
and carpenter as pertains to the installation of skylights and the fall
prevention/protection associated therewith.”





[13]
Estrin’s qualifications listed in his affidavit are considerably more lengthy
than represented here, but appellees do not attack his qualifications, so we
offer a mere excerpt to demonstrate part of the foundation of his opinions.

 





[14] See Gammill, 972 S.W.2d at 727.

 





[15] The
Occupational Safety and Health Administration. 
The regulations in dispute are contained in 29 C.F.R. pt. 1926.

 





[16]
Although the deposition and the affidavit were not attached to the original
response to the motion to exclude, they were attached to a supplemental
response.  Appellees make no arguments
regarding timeliness of the supplemental response.

 





[17] See K-Mart Corporation v. Honeycutt, 24
S.W.3d 357, 360 (Tex.
2000) (stating expert testimony is inadmissible on a matter obviously within
the common knowledge because such testimony is of no assistance to the jury).

 





[18]
Appellees cite to the Texas Supreme Court’s opinion in Honeycutt in support of their contention that Estrin’s testimony
was a matter of general knowledge.  24
S.W.3d 357.  In Honeycutt, the plaintiffs claimed damages as a result of being hit
by shopping carts pushed by a K-Mart employee while plaintiff was sitting on
the bottom rail of the “cart corral” and the corral was missing a portion of
the top rail.  Id.
at 359.  The plaintiff’s safety expert opined
that (1) the lack of a top rail created an unreasonable risk of injury, (2) the
accident would not have occurred except for the lack of a top rail, (3) the
employee was not properly trained in pushing carts, (4) the employee failed to
keep a proper lookout, and (5) the plaintiff was not contributorily negligent
for sitting on the bottom rail.  See id. 
The supreme court found that the jurors did not require an expert
opinion to determine whether the lack of a top rail was unreasonably dangerous,
whether the shopping carts were pushed properly, or whether the plaintiff was
negligent in sitting on the bottom rail. 
See id. at 361.  Pushing shopping carts and the absence of a
rail are a far cry from the necessity and availability of fall protection in
high level building construction. 
Accordingly, Honeycutt is
easily distinguishable from the present case.

 





[19]
In Maddox, the court held that OSHA
regulations “do not establish a mandatory standard of conduct, but rather
reflect a standard of care for which the duty of compliance is conditioned on
what is possible or practicable.”  67
S.W.3d at 457–58.

 





[20] See Tex.
R. App. P. 33.1(a) (providing that to preserve complaint for appellate
review, party must make a timely and sufficiently specific request, objection,
or motion).

 





[21] See, e.g., Knox v. Taylor , 992 S.W.2d 40, 65 (Tex. App.—Houston [14th
Dist.] 1999, no pet.) (holding complaint on appeal must comport with objection
in trial court).

 





[22]
Although not mentioned on appeal, in their third filing attacking Estrin in the
trial court, appellees argued that he should not be allowed to testify
regarding the existence of an OSHA violation (1) because explaining the law to
the jury is a function of the court and not expert witnesses, and (2) because
Estrin was not an employee of OSHA or a representative of the Secretary of
Labor and thus was not qualified to testify regarding OSHA violations.  Again, these arguments do not comport with
the arguments made on appeal.  In the
trial court, appellees attacked the procedure
of allowing Estrin to read regulations to the jury and his qualifications to discuss those regulations, but on appeal, they
attack the substance of his
testimony.  That substance was never
objected to in the trial court and therefore cannot be a basis for reversal.

 





[23]
Appellees’ specific objections to Dr. Mayor’s testimony are largely based on Robinson factors that are not relevant
to an analysis of his nonscientific testimony. 
See Gammill, 972 S.W.2d at
726.  For example, appellees contended
Mayor’s report had not been subjected to peer review and was prepared
specifically for this litigation, and that he had not verified the statistical
data he used.  Robinson and Gammill
cannot be read to require every expert to have their report peer reviewed, and
Mayor’s explanation of his methodology and sources of data were clearly
sufficient to indicate reliability. See Gammill,
972 S.W.2d at 728; Robinson, 923
S.W.2d at 556-57.

 





[24]
Regarding Winkler’s testimony, appellees again scattershoot objections based
largely on the Robinson factors.  Appellees also argue Winkler’s method of
preparing life care plans had not been shown to be “verified or peer
reviewed.”  To the contrary, Winkler
testified at length regarding literature in the field, the training and
certification process that he completed, and his own publications in the field.  Appellees objections are without merit.

 





[25]
Appellees make no arguments against Dr. Havins’ testimony not already addressed
above.

 





[26] See, e.g., Woodrum Truck Lines v. Bailey,
57 S.W.2d 92, 94 (Tex. Comm’n App. 1933, judgm’t adopted); Willacy County Drainage Dist. v. Kocurek, 717 S.W.2d 461, 463 (Tex.
App.—Corpus Christi 1986, no writ); see
also 4 Elaine A. Grafton Carlson,
McDonald & Carlson Texas
Civil Practice  § 21:43 (2d ed. 2001).  But cf.
Judge Adele Hedges & Daniel K.
Hedges, Texas Practice Guide: Civil Trial §§ 11:91-11:96 (2003) (stating
“Texas law is not clear whether jury views are permissible,” but acknowledging
a viewing does not constitute evidence). 
We further note that jury views are unquestionably error in criminal
trials.  See Mauricio v. State, 104 S.W.2d 919, 921-22 (Tex.
App.—Houston
[14th Dist.] 2003, no pet. h.) (questioning rationale of rule but following
precedent barring jury views).

 





[27] See City of Pearland v. Alexander, 468
S.W.2d 917, 926 (Tex. App.—Houston [1st Dist.] 1971) (“It is generally
considered . . . that jury view in Texas is
permissible at the discretion of the trial court only with consent of all
parties to the suit.”), rev’d on other
grounds, 483 S.W.2d 244 (Tex.
1972).

 





[28] See Tex.
R. App. P. 44.1.

 





[29] Weidner
v. Sanchez, 14 S.W.3d 353, 377–78 (Tex.
App. —Houston
[14th Dist.] 2000, no pet.).

 





[30] Specifically,
there was testimony that the skylights were the same as at the time of the
accident and even that the size of the building was the same.  Photographs and schematics were also admitted
showing various parts of the premises.

 





[31]
The jury awarded $1 million each for past impairment, future impairment, past
pain and mental anguish, and future pain and mental anguish.  It awarded $172,674 for past loss of earning
capacity but zero for future loss of earning capacity.

 





[32] See Weidner, 14 S.W.3d at 377–78.

 





[33] Melendez v.
Exxon Corp., 998 S.W.2d 266, 280 (Tex. App.—Houston [14th Dist.] 1999, no
pet.) (citing Standard Fire Ins. Co. v.
Reese, 584 S.W.2d 835, 839 (Tex.
1979)).

 





[34] See Tex.
R. App. P. 33.1(a) (providing that to preserve error for appeal party
must make a sufficiently specific and timely request, objection, or motion); cf. Busse
v. Pac. Cattle Feeding Fund No. 1, Ltd.,
896 S.W.2d 807, 816 (Tex. App.—Texarkana 1995, writ denied) (holding failure to
obtain ruling waived issue of improper jury argument).

 





[35] See Tex.
R. Civ. P. 324(b).





[36] See, e.g., Tex. R. Evid. 411; Dennis
v. Hulse, 362 S.W.2d 308, 309 (Tex.
1962).

 





[37] Dennis, 362 S.W.2d at 309.

 





[38] See, e.g., Turner, Collie & Braden Inc.
v. Brookhollow, Inc., 642 S.W.2d 160, 167 (Tex. 1982); In re J.A., 109 S.W.3d 869, 874–75 (Tex. App.—Dallas 2003, pet.
filed).

 





[39] See, e.g., Lee v. Lee, 47 S.W.3d 767,
777 (Tex. App.—Houston
[14th Dist.] 2001, pet. denied) (stating that benefits from a collateral source
may not be credited to tortfeasor); Exxon
Corp. v. Shuttlesworth, 800 S.W.2d 902, 907-08 (Tex. App.—Houston [14th
Dist.] 1990, no writ) (holding evidence regarding worker’s compensation
benefits was properly excluded by trial court); see also Restatement
(second) of Torts § 920A (1979).

 





[40] See note 40 supra.

 





[41] See Tarrant County Waste Disposal, Inc. v.
Doss, 737 S.W.2d 607, 611 (Tex. App.—Fort Worth 1987, writ denied); S. Pac. Transp. Co. v. Allen, 525 S.W.2d
300, 306 (Tex. Civ. App.—Houston [14th Dist.] 1975, no writ); Restatement (second) of Torts § 920A
cmt. a.  In Allen, we stated “as to payments made by employers, it is the
nature of the payments, not their source, which is determinative of the
question of the applicability of the collateral source rule.”  Allen,
525 S.W.2d at 306.

 





[42] See Doss, 737 S.W.2d at 611–12.  Appellees suggest that the El Paso Court of
Appeals opinion in Castillo v. American
Garment Finishers Corp., 965 S.W.2d 646 (Tex. App.—El Paso 1998, no pet.),
stands for the proposition that a non-participant in Workers’ Compensation does
not have to present any other evidence regarding an insurance policy in order
to get an offset against tort damages. 
Although the Castillo court
does rather summarily come to the conclusion that the purpose of the benefit
plan at issue was to protect the employer, it makes no such holding as
appellees suggest.  Id.
at 650.  Instead, the court simply cited
the Doss case, 737 S.W.2d 607, and
then went on to address a novel issue regarding how the offset is to be applied.  Doss
and other authorities make it clear that the benefit plan must be shown to be
for the primary purpose of protecting the employer before payments can be used
to offset damages.  737 S.W.2d at 611; see also Allen, 525 S.W.2d at 306; Restatement (second) of Torts § 920A
cmt. a.

 





[43] See Doss, 737 S.W.2d at 611.

 





[44]
The record also contains a letter, signed by Charles Taylor indicating he had
read and understood it, stating that the company had established a benefit plan
for on–the–job–injuries.  This document
further supports the interpretation that the business only intended to cover
on–the–job injuries.

 





[45]
The policy defines “Plan” to mean “the Insured’s employee welfare benefit plan
to the extent it provides benefits to employees for Occupational Injury,
Occupational Disease or Cumulative Trauma occurring in the Scope of Employment.
. . .”

 





[46] In
Allen, we examined in detail the terms
of the policy, specifically noting that in addition to “on–duty” coverage it
also included coverage for the off–duty employee and the employee’s
family.  525 S.W.2d at 307.  On that basis, we affirmed the trial court’s
refusal to award an offset based on the collateral source rule.  Id.

 





[47] See Doss, 737 S.W.2d at 611–12.

 





[48]
The checks made out directly to Taylor
were apparently for disability payments.

 





[49] See, e.g., Lee-Wright, Inc. v. Hall, 840
S.W.2d 572, 582 (Tex. App.—Houston [1st Dist.] 1992, no writ) (Workers’ Compensation
benefits); Shuttlesworth, 800 S.W.2d at
907-08 (same); Hall v. Birchfield,
718 S.W.2d 313, 338 (Tex. App.—Texarkana 1986) (state provided services free of
charge), rev’d on other grounds, 747
S.W.2d 361 (Tex. 1988); Montandon v.
Colehour, 469 S.W.2d 222, 229 (Tex. Civ. App.—Fort Worth 1971, no writ)
(Veteran’s Administration benefits); Tex.
Gen. Indem. Co. v. Hamilton, 420 S.W.2d 735, 738 (Tex. Civ. App.—San
Antonio 1967, writ ref’d n.r.e.) (Social Security benefits); Traders & Gen. Ins. Co. v. Reed, 376
S.W.2d 591, 593 (Tex.
Civ. App.—Corpus Christi 1964, writ ref’d n.r.e.) (same).

 





[50] See, e.g., Shuttlesworth, 800 S.W.2d at
907-08; J.R. Beadel & Co. v. De La
Garza, 690 S.W.2d 71, 74 (Tex.
App.—Dallas 1985, writ ref’d n.r.e.).





[51]
Senior Chief Justice Paul C. Murphy sitting by assignment.